Filed 8/22/24  Executive Dynamics Search v. Lawrence CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| EXECUTIVE DYNAMICS SEARCH, INC., et al., | D081732 |
| Plaintiffs, Cross-defendants and Respondents, | (Super. Ct. No. 37-2019-00048004-CU-BC-NC) |
| v. | |
| MILES LAWRENCE, as Successor Trustee, etc., et al., | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendants, Cross-complainants and Appellants. | NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on July 25, 2024 be modified as follows:

1.     On page 43, in the first full paragraph, the third sentence that begins with "Defendants have not challenged," is modified so that the sentence reads:

> Defendants have not challenged the trial court's decision to grant plaintiffs rescission of the guaranty of lease.

2.      On page 43, in the first full paragraph, the fourth sentence that begins with "Further, the trial court's decision," is deleted. It is replaced with the following sentence and citations:

>Defendants' failure to argue in their appellate briefs that this decision was erroneous forfeits the issue. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4 [issue not raised on appeal deemed waived]; *Eck v. City of Los Angeles* (2019) 41 Cal.App.5th 141, 146 [same].)

There is no change in the judgment.

The petition for rehearing filed August 1, 2024 is denied.

McCONNELL, P. J.

Copies to: All parties

Filed 7/25/24  Executive Dynamics Search v. Lawrence CA4/1 (unmodified opinion)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| EXECUTIVE DYNAMICS SEARCH, INC., et al.,<br><br>  Plaintiffs, Cross-defendants and Respondents,<br><br>  v.<br><br>MILES LAWRENCE, as Successor Trustee, etc., et al.,<br><br>  Defendants, Cross-complainants and Appellants. | D081732<br><br><br><br>(Super. Ct. No. 37-2019-00048004-CU-BC-NC) |

APPEAL from a judgment of the Superior Court of San Diego County, Kevin A. Enright, Judge.  Reversed in part and remanded with directions.

Procopio, Cory, Hargreaves & Savitch, Kendra J. Hall, and Megan E. Dawson for Defendants, Cross-complainants and Appellants.

Pennington Law Firm and Walt Pennington for Plaintiffs, Cross-defendants and Respondents.

## INTRODUCTION

This appeal comes before us following a bench trial in which the essential dispute surrounded the cause of congestion and rashes experienced

by workers in an office suite. Executive Dynamics Search, Inc. (EDS), an executive recruitment agency, leased the suite from defendants/appellants.[1] The lease was guaranteed by the owners of EDS, Richard C. Leon (Leon) and Ann W. Leon (collectively, plaintiffs).

Six months into EDS's occupancy of the suite, Leon and EDS staff members experienced symptoms that included congestion and rashes that seemed to be alleviated upon leaving the office. Plaintiffs reported the symptoms to the building's property manager but quickly became dissatisfied with defendants' response. Plaintiffs gave notice of rescission, vacated the suite and filed this lawsuit, asserting causes of action for rescission and negligence (among others). Defendants cross-claimed for breach of the lease and guaranty of lease.

At a bench trial, plaintiffs' only medical expert on causation opined the cause of the reported symptoms was "something in that environment." The trial court found in favor of plaintiffs on the claims for negligence and rescission of the lease and guaranty of lease, granted rescission, and awarded Leon personal injury damages for defendants' negligence. In doing so, it found an "unknown contaminant" caused the reported symptoms. Having rescinded the lease and guaranty of lease, it dismissed defendants' cross-complaint as moot.

Defendants raise a number of challenges to the resulting judgment, including that the trial court's causation finding is not supported by

---

[1]    Defendants/appellants are Miles Lawrence, as successor trustee of the Lawrence 1989 Residual Trust dated 10/16/1989; Gregory Eden, as successor trustee of the Matthew Daley Irrevocable Trust; Gregory Eden, as successor trustee of the Andrew Daley Irrevocable Trust; Gregory Eden, as successor trustee of the Michael Daley Irrevocable Trust; and IPW/REIMS Corporation dba Eagle Industries (IPW/REIMS).

substantial evidence. We agree and conclude the insufficient evidence of causation requires reversal of the trial court's finding of liability on negligence as well as its decision to grant plaintiffs rescission of the lease, and its associated determination that defendants' cross-claims based on breach of lease were moot. We reverse the judgment in part with directions and remand for further proceedings on defendants' cross-claims for breach of lease.

FACTUAL AND PROCEDURAL BACKGROUND

I.

*EDS's Occupancy of the Suite*

Defendants are the owners of a multi-unit office building[2] in Encinitas. In 2018, EDS leased a 1,336-square-foot office suite in the building. The lease, guaranteed by the Leons, was for a three-year term commencing February 1, 2019 and ending January 31, 2022. EDS took possession no later than the beginning of February 2019.

Paragraph 1.13 of the lease stated defendants were not obligated to provide janitorial services within the suite. EDS did not use an outside cleaning service. Instead, Leon or EDS staff members would "chip in" with the cleaning.

Between February and June 2019, Danelle De Valk (Leon's executive assistant) contacted Tanya Mauzy, the building's property manager, about "minor" issues. But on July 9, De Valk emailed Mauzy to report there was

_____

[2] Defendants state without record citation that their office building has 10 units. Although we did not find evidence to support this precise claim, testimony established there were "about a dozen" HVAC units on the building's roof. From this, we infer there were multiple units.

3

"something either in the air or in the carpets" that was "causing itching and full-blown rashes" to EDS personnel "only . . . when [they're] in the office."

Having never "seen anything like this" in her 15 years of commercial property management, Mauzy suggested EDS consider whether it had changed cleaning products.[3] She also arranged to have ServPro, a remediation contractor, conduct air particle testing in EDS's suite. EDS, however, unilaterally cancelled the ServPro inspection and hired a different contractor to test the EDS suite for mold. The results of the mold test were negative. On July 10, 2019, De Valk reported to Mauzy that EDS's mold contractor found no mold but did find the vents in the EDS suite to be "incredibly dirty." She asked Mauzy to arrange for the air ducts to the suite's HVAC unit be cleaned.

In response, Mauzy reached out to a company that was contracted to provide the building's HVAC units (including the unit associated with EDS's suite) with regular maintenance, including quarterly air filter changes. She confirmed the company's servicing of the units had not been interrupted. She then obtained a proposal from J&M Keystone, a company that provided HVAC cleaning services, to clean the EDS suite's air ducts. On July 16, 2019, she emailed the proposal to defendants and asked them to approve the cost. They declined because they wanted more information about the possible causes of the symptoms "before spending money looking for answers."

That evening, Mauzy emailed Leon. Her email stated, "I have received a reply from the owners and they are declining to cover the cost of the service –stating that it appears to them to be a possible allergic reaction, that dust

---

[3]    According to the trial testimony, EDS determined it had not changed cleaning products, although the record does not reflect that this information was communicated to Mauzy.

4

and dirt would not cause that. They are stating that they would require more proof in the form of multiple dermatologists' opinions. The Landlord has suggested that the person with the skin irritation invest in a portable HEPA air cleaner. Their final directive was that all costs to be absorbed by the tenant, they do not approve at this time."

This email elicited a host of responses from Leon. Less than an hour after Mauzy sent her email, Leon responded to her with text messages that used profane language and threatened a legal "fight." The next morning, Leon emailed Mauzy, stating, "I will be meeting with my attorney this morning and the City of Encinitas to report multiple dose violations at this building. . . . You and the owners are in material breach of contract and we are canceling our lease immediately." On the afternoon of July 18, 2019, Leon emailed Mauzy a list of steps he intended to take, including complaining to government authorities and meeting with his attorney "to discuss pending litigation," unless his demand "to clean" was met by close of business that day. That evening, he emailed Mauzy: "OK Time is Up. [¶] Everything I promised is Now going to happen. Kinda feel sorry for you NOT! [¶] We are going to start with A $1 Million damages suit. See you in Court Sweethearts!" At this point, Mauzy stepped back because she felt the situation had become "legal."

On July 25, 2019, Leon contacted the San Diego Air Pollution Control District (District) and complained there was asbestos in the EDS suite. A District investigator inspected the suite on July 29. He noticed a musty odor as well as dust on desk surfaces that was "more noticeable than . . . background dust," meaning "dust that's normal to everyday activity, windows were open and things like that." But he detected no asbestos, no airborne contaminants, and no visual emissions, and he was unable to pinpoint the

5

location, if any, of the odor.  He recommended the District take no further action on Leon's complaint.

On July 31, 2019, Leon complained to the Division of Occupational Safety and Health (Cal/OSHA), which dispatched an investigator to test the EDS suite for fiberglass.  This investigator determined the airborne fiber concentration in the suite was well below the acceptable limit, and he observed no debris, dust, residue, or dirt in the suite.  He later recalled that after exiting the suite, he "felt a little bit of an itchy sensation" in an area of exposed skin on his neck.

After mid-July 2019, EDS personnel did not return to the office suite except to retrieve files.  Leon entered the office only to meet investigators and move items out of the office.  In August, De Valk observed a "decent layer of either dust or dirt" covering her desk; and Leon saw visible "rusty, black dust" on the carpet and desks that he had not seen in June.

Despite Leon's earlier written cancellation of the lease, EDS paid rent in August.  However, on August 12, Leon's lawyer sent a "Notification of Rescission and Termination of Lease and Guaranty" to Mauzy.

Leon's lawyer then had three retained consultants examine the suite. On August 22, 2019, Colin Young, an industrial hygienist, inspected the suite but found no particulates, odors, chemicals, or stains "of any remarkability." On August 29, Paul McGowan, a consultant with expertise in HVAC systems, inspected the HVAC unit to the EDS suite and found it to be inadequately maintained.  He detected an "abnormal" smell on the roof and in the office and experienced trouble breathing.  However, he did not have an opinion whether the HVAC unit was adequately filtering outside air.  On September 4, Alan Wilson, a mechanical engineer consultant, inspected the HVAC unit and found it to be very poorly maintained (he rated it a "two" on a

6

scale of one to 10, with 10 being the best). He found its air filter to be ill-fitting, and opined there was "more dust in this system than there should be because of the poor maintenance." But he did not detect abnormal smells or air quality issues in the suite. In his opinion, an industrial hygienist would be the appropriate expert to investigate and reach opinions regarding air quality inside the suite.

On September 6, 2019, Leon asked Young to conduct a second inspection of the suite so he could attend and meet with Young in person. At the end of this inspection, Young again concluded "there still [was not] a substantiated basis for an impaired environment that either exists or did exist in [the suite]." That same day, the Leons and EDS filed their lawsuit against defendants.

## II.

### *Plaintiffs' Lawsuit*

In their operative first amended complaint, plaintiffs asserted four causes of action: (1) rescission of the lease and guaranty of lease; (2) breach of lease; (3) negligence; and (4) negligent misrepresentation. In their causes of action for rescission and for breach of lease, they alleged the "failure of the HVAC and ventilation system" had made continued use of the premises unsafe, forcing EDS to close its business at the premises on July 14, 2019. Their third cause of action for negligence was based on allegations the "ongoing failure of the HVAC and ventilation system" was the proximate cause of physical injury to Leon. In their fourth cause of action, they alleged defendants had induced them to enter the lease by misrepresenting the HVAC system to be in good operating condition.

Defendants cross-complained for breach of the lease and guaranty of lease.

7

*Trial Evidence*

Defendants moved for judgment on the pleadings, arguing all of plaintiffs' causes of action were barred by a lease provision limiting their liability.[4]  The trial court granted the motion as to the breach of lease claim only.  An 11-day bench trial was then held on all remaining claims and cross-claims.

A.    *Testimony of Leon and EDS Personnel*

Plaintiffs' trial presentation included testimony from Leon, De Valk, and two former EDS employees.  One former EDS employee recalled a time when she was in the office in July 2019 and her lungs felt "heavy," like "there was a big fire in the area or there's bad smog, that sort of feeling."  After she left the office, the feeling dissipated.  A second former employee who suffered from "spring" allergies noticed in July 2019 that after about an hour or two in the office, she would start to get congested; the congestion was "a little bit different" from when she got allergies.  Her symptoms would go away after she got home.  De Valk testified that while in the office in early July 2019, she felt congestion and developed rashes on her chest, arms, and stomach.

---

[4]    The relevant provision was paragraph 8.8 of the lease, which provided, "Notwithstanding the negligence or breach of th[e] Lease by Lessor or its agents," the lessor was exempt from liability for certain types of injury or damage, including damages from "indoor air quality" or "HVAC . . . fixtures," "conditions arising upon the Premises or upon other portions of the building or from other sources or places," and "injury to Lessee's business or for any loss of income or profit therefrom."  Paragraph 8.8 stated, "[I]t is intended that Lessee's sole recourse in the event of such damages or injury [shall] be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8."

These symptoms would gradually go away within a few hours after she left the office. She stopped going to the office on July 9 or 10.

Leon testified that after De Valk's symptoms appeared, he began to experience chest congestion and rashes that were different from De Valk's. His symptoms were worse when he was in the office, although they persisted. He "experienced them . . . all night long." Although he stopped working at the office in mid-July 2019, by late July his symptoms had not improved and instead "were becoming more serious." His congestion lasted into early December and improved only following treatment by an acupressurist.[5]

B.  *Plaintiffs' Medical Witnesses*

Although Leon testified he saw "multiple" doctors for his symptoms, only two testified at trial—Scott Mercer, M.D., and Warren Pleskow, M.D.

Dr. Mercer was Leon's primary care physician. He saw Leon on August 5 and 21, 2019. Leon told Mercer he had been exposed to an "antigen" and complained of chest congestion, breathing difficulties, and rashes. Mercer performed a lung auscultation but detected no wheezing or congestion. He conducted a complete physical exam as well as an oxygen saturation test. Leon's oxygen saturation was 98 percent, which Mercer testified was "very, very, very good." Mercer observed rashes on August 21; however, the rashes were "fine," as opposed to "blistery." Mercer did not form an opinion with respect to their cause, nor did he form an opinion as to whether there was an air contaminant in Leon's office.

---

[5]  EDS also presented testimony from the District investigator and Cal/OSHA investigator who inspected the suite, as well as McGowan and Wilson, all of whom testified consistently with the facts we summarized in Section I, *ante*.

Dr. Pleskow is an allergist and immunologist who saw Leon two years after the events, in April 2021. Leon gave Pleskow an oral history in which he said, first, that in July 2019 "an industrial hygienist had come to inspect his . . . office, and a contaminated and leaking HVAC was found." Second, Leon reported pain and pressure in his chest, "blistering of the skin, which continued until September or October of 2019, and congestion in his chest and sinuses, which lasted until December of 2019." Leon said his symptoms improved when he was away from the office. Pleskow did not review any of Leon's prior medical records. However, he tested Leon and determined he was allergic to cats and dust mites.[6] Based on this finding and on the oral history Leon provided, Pleskow testified it was his "opinion" Leon had a reaction to dust mites in the office in July 2019, though he conceded on cross-examination that he had formed only "a suspicion" that dust mites were the problem. In his view, however, there was not "a big difference" between an opinion and a suspicion. Pleskow also agreed the symptoms Leon voiced to him "could have a number of causes," including "causes or possible causes . . . that would not be allergic in nature." And when asked to provide his opinion on the cause of Leon's symptoms to a reasonable degree of medical probability, Pleskow stated his opinion was merely that Leon "was sick from exposure to something in that environment."

---

[6] De Valk also saw Dr. Pleskow in 2021. She told him she "worked in an office building which had mold and mite contamination" and had suffered rashes and nasal congestion for a two-week period in July 2019. Her skin test showed she was allergic to pollens, grasses, trees, and highly allergic to dust mites, but was negative for mold. Based on these results, Pleskow made "the reasonable assumption that she was having symptoms in 2019 related to her exposure in this environment."

10

C.     *Defendants' Case*

Young, the consultant who examined the EDS suite in August and September 2019, was called by defendants and was the only industrial hygienist to testify at trial. He testified that during his initial inspection of the suite he found nothing "remotely indicative" of an unsafe environment. After inspecting it a second time, he still found no substantiated basis for finding "an impaired environment that either exists or did exist in that location." He was aware Wilson (the mechanical engineer consultant who inspected the HVAC unit on September 4, 2019 at EDS's request) found it to be in a deteriorated condition. Young testified, however, that it was common to see HVAC ducts with dust and dirt, and "an impaired mechanical unit is not an implication of an impaired indoor air quality space."

In addition to Young, defendants presented testimony from other expert and percipient witnesses, including Mauzy, Gregory Eden (one of the trustee lessors), and retained medical and HVAC experts. Michael J. Welch, M.D., defendants' retained allergist and immunologist, testified "the problem that was experienced here was not a medical problem consistent with any allergic mechanism" and "dust mite allergy would not be adequate in explaining the clinical picture . . . that has been described." He also testified there is a difference between dust and dust mites, and that dust mites are generally found in the home, not in an office setting.

IV.

*Statement of Decision*

At the close of evidence, defendants filed a motion for nonsuit in which they argued, in part, that plaintiffs had failed to present sufficient evidence of causation to support their claims. The trial court issued a decision and order construing defendants' motion for nonsuit as a motion for judgment

11

(Code Civ. Proc.,[7] § 631.8). It granted the motion as to plaintiffs' negligent misrepresentation claim, but ruled in favor of them and against defendants on the claims for rescission and negligence as well as on defendants' cross-claims. Defendants then filed a request for statement of decision. Plaintiffs' counsel prepared a proposed statement of decision, which was adopted by the trial court with few changes.[8]

The statement of decision began with a lengthy factual background section. Although the factual background section quoted and summarized the testimony of most trial witnesses, it did not address or summarize Young's trial testimony. Next, under a heading titled "Witness Credibility," the trial court found "[p]laintiffs' witnesses to be credible regarding their complaints of symptoms they experienced beginning in July 2019." It then stated: "The Court finds that it was more likely than not some type of contaminant within the leased premises caused their symptoms to occur. While [p]laintiffs have not shown what specific contaminant was present, such does not preclude a finding that the unknown contaminant caused the symptoms about which the complainants testified." It found the HVAC unit was not clean in July and August 2019 and had been poorly maintained, and

---

[7] Undesignated statutory references are to the Code of Civil Procedure.

[8] We make note of the following change: the proposed statement of decision provided, "There are two bases to hold [d]efendants liable for their negligence: res ipsa loquitur and premises liability." It presented case authority and discussion pertaining to both grounds for liability. The trial court modified this section of the proposed statement of decision by deleting the references to res ipsa loquitur. Thus, in its final statement of decision, the court expressly relied only on a premises liability theory, and not on the doctrine of res ipsa loquitur, in ruling that defendants were liable for negligence.

that a significant amount of dust had accumulated on desktops and exposed carpet in the summer of 2019. It concluded: "Accordingly, the [c]ourt finds that [p]laintiffs have met their burden of proof that more likely than not the source of the contamination of the leased premises was the HVAC unit servicing the suite."

Specifically as to the negligence claim, the trial court found "the symptoms of illness experienced" by EDS personnel "were more likely than not caused by a contaminant present within the leased premises due to the poor maintenance of the HVAC unit servicing the premises." It concluded plaintiffs had met their burden of establishing all elements of negligence, including that "Leon was harmed, and that [d]efendants' negligence was a substantial factor in causing [p]laintiffs' harm." Although the court expressly acknowledged the operative complaint did not allege premises liability, it appeared to analogize the negligence claim to one of premises liability. It awarded Leon $50,000 in general damages for his pain and suffering from mid-July through December 2019.

Turning to the rescission claim, the trial court observed the lease included the implied covenant of quiet enjoyment (Civ. Code, § 1927) as well as a clause expressly providing for quiet possession. It stated that for EDS, quiet enjoyment was the ability to use its office suite as a "General Office." It observed that plaintiffs' witnesses "testified that the onset of symptoms was within one-half hour of exposure." It found defendants "failed to comply with their contractual duties" and "failed to provide their consideration, usable office space" when they "told EDS that [they] would not clean the ducts and would take no further action until [d]efendants provided medical proof that the office was the cause of their health problems."

13

The trial court granted rescission of the lease and guaranty of lease. As a remedy for rescission, it awarded EDS $339,824 in damages, representing its lost profits for the 10-month period beginning July 2019 and ending April 2020. It offset this award by $3,468.60, representing 41 days' rent, to reflect that plaintiffs gave only 19 days' notice of rescission rather than 60 days as required by the lease. The total damages awarded to EDS was $336,355.40. Having rescinded the lease, the court found defendants' contract claims in the cross-complaint were moot.

## V.

### *Post-trial Proceedings*

Following contested motions for attorney fees, on November 8, 2022, the trial court determined plaintiffs were the prevailing parties and awarded them $781,264 in attorney fees pursuant to Civil Code section 1717; it also denied defendants' motion to tax costs.

On December 14, 2022, the trial court entered judgment for plaintiffs and against defendants in the total amount of $1,278,562.09 (inclusive of awards of $336,355.40 to EDS; $50,000 to Leon; and $781,264 in plaintiffs' attorney fees plus $110,942.69 in costs). Notice of entry of judgment was served January 9, 2023. Defendants brought a motion for judgment notwithstanding the verdict (JNOV) and motion for new trial, which the court denied.

## DISCUSSION

### I.

### *Defendants' Notice of Appeal Was Timely*

We first address the timeliness of defendants' notice of appeal. On April 3, 2023, plaintiffs moved to dismiss defendants' appeal on the ground the notice of appeal, which was filed on February 27, 2023, was untimely. On

14

April 21, we issued an order summarily denying the opposed motion. Plaintiffs, undeterred, have asserted in their respondents' brief on the merits several arguments challenging the timeliness of the notice of appeal. Although they claim to be relying on new arguments, they also reassert their previous points. None alter our conclusion that defendants' notice of appeal was timely filed. Although we are not required to revisit positions we have already considered and properly rejected, we will explain our reasons for disagreeing with plaintiffs' previous arguments as well as discuss why their new ones lack merit.

A. *Our Denial of Plaintiffs' Motion to Dismiss Was Proper*

After issuing its statement of decision and awarding plaintiffs their costs and attorney fees, the trial court entered judgment on December 14, 2022. A deputy clerk of the superior court served the parties with a file-stamped copy of the judgment by mail on December 15.[9] Defendants served their notice of motion for new trial and notice of JNOV motion on January 3, 2023. Plaintiffs filed and served a notice of entry of judgment on January 9. The trial court denied defendants' new trial and JNOV motions on February 16. Defendants then filed their notice of appeal on February 27.

The issue raised in plaintiffs' motion to dismiss was whether defendants' January 3 notices of posttrial motions were timely. Under section 659, a party must file and serve a notice of intention to move for new trial "[*w*]*ithin 15 days of the date of mailing notice of entry of judgment by the clerk of the court pursuant to [s]ection 664.5*, or service upon him or her by any party of written notice of entry of judgment, or within 180 days after the

---

9    Although plaintiffs contend the clerk sent the notice on December 14, the proof of service shows it was actually served on December 15.

15

entry of judgment, *whichever is earliest*[.]" (*Id.*, subd. (a)(2), italics added.) These deadlines also apply to JNOV motions. (See § 629, subd. (b) ["A motion for judgment notwithstanding the verdict shall be made within the period specified by [s]ection 659 for the filing and service of a notice of intention to move for a new trial."].)

The issue was potentially jurisdictional because only a timely notice of posttrial motion tolls the deadline for filing a notice of appeal. (See Cal. Rules of Court, rule 8.108(b), (d) [notice of appeal deadline extended if any party serves and files "valid" notice of intention to move for new trial or motion JNOV]; *Ramirez v. Moran* (1988) 201 Cal.App.3d 431, 437 [untimely posttrial motion not "valid" and does not extend appeal deadline].) According to plaintiffs, the extension mattered because without it, defendants had only 60 days from the clerk's December 15, 2022 service of the file-stamped judgment—until February 13, 2023—to file their notice of appeal, yet their notice of appeal was not filed until February 27, 2023. (See Cal. Rules of Court, rule 8.104(a)(1)(A) ["Unless a statute or rules 8.108, 8.702, or 8.712 provides otherwise, a notice of appeal must be filed on or before the earliest of: [¶] (A) 60 days after the superior court clerk serves on the party filing the notice of appeal a document entitled 'Notice of Entry' of judgment or a filed-endorsed copy of the judgment, showing the date either was served[.]"].) Plaintiffs conceded, however, that if defendants' notices of posttrial motions were timely, then their notice of appeal was also timely.[10]

---

10    A timely served and filed notice of new trial motion or JNOV motion triggers three possible extensions of the deadline for filing a notice of appeal. First, if such motions are expressly denied, a 30-day extension of the notice of appeal deadline runs from the date the denial order or a notice of entry of the denial order is served by the superior court clerk or a party. (Cal. Rules of Court, rule 8.108(b)(1)(A), (d)(1)(A).) Second, if there is no service of either the denial order or notice of its entry, then the time to appeal is 180 days

16

As noted, defendants filed and served their notice of motion for new trial and notice of motion JNOV on January 3, 2023. Plaintiffs argued the clerk's December 15 service of the conformed copy of the judgment met the requirements of section 659, subdivision (a)(2), thus triggering the requirement that defendants file and serve their notices of posttrial motions within 15 days. According to plaintiffs' argument, because defendants' notices were not filed and served by December 30, they were untimely and therefore ineffective to extend the time to appeal.

The reason we rejected this argument and denied plaintiffs' motion for dismissal is that the clerk's December 15 service did not, in fact, meet the requirements of section 659, subdivision (a)(2). Under this statute, the 15-day period in which to file a notice of intent to bring a new trial motion is triggered when the clerk mails notice of entry of judgment "pursuant to [s]ection 664.5." Relevant here, section 664.5, subdivision (d) provides: "*Upon order of the court* in any action or special proceeding, the clerk shall serve notice of entry of any judgment or ruling, whether or not appealable." (Italics added.) The words "[u]pon order of the court" have been interpreted by the California Supreme Court to impose stringent requirements. "[T]o qualify as a notice of entry of judgment under . . . section 664.5, the clerk's mailed notice must affirmatively state that it was given 'upon order by the court' or 'under section 664.5,' and a certificate of mailing the notice must be

after entry of judgment. (Cal. Rules of Court, rule 8.108(b)(1)(C), (d)(1)(C).) Third, if such motions are denied by operation of law (that is, by the court's failure to decide them within 75 days of service of a filed-endorsed copy of the judgment) (§ 660, subd. (c)), then a 30-day extension of the deadline to file a notice of appeal applies from the date of the deemed denial (Cal. Rules of Court, rule 8.108(b)(1)(B), (d)(1)(B)). There is no dispute defendants' February 27, 2023 notice of appeal fell within all three of these possible extended deadlines.

17

executed and placed in the file." (*Van Beurden Ins. Services, Inc. v. Customized Worldwide Weather Ins. Agency, Inc.* (1997) 15 Cal.4th 51, 64 (*Van Beurden*).)

Here, the clerk's December 15, 2022 notice did not affirmatively state that it was given "upon order by the court" or "under section 664.5." Instead, the clerk merely certified that a "true copy of the JUDGMENT UPON STATEMENT OF DECISION was mailed following standard court practices in a sealed envelope." Under *Van Beurden*, this notice was insufficient to qualify as a notice of entry of judgment under section 664.5. (*Van Beurden, supra,* 15 Cal.4th at p. 64.)

Although plaintiffs argued *Van Beurden* was abrogated by *Palmer v. GTE California, Inc.* (2003) 30 Cal.4th 1265, they were incorrect. To the contrary, *Palmer* expressly *approved* of the rule in *Van Beurden* that "to be service pursuant to [s]ection 664.5 (§§ 659, 660), the notice of entry of judgment mailed by the clerk must affirmatively state it is given upon order by the court or under section 664.5." (*Palmer*, at p. 1277 [cleaned up]; see *Simgel Co., Inc. v. Jaguar Land Rover North America, LLC* (2020) 55 Cal.App.5th 305, 314 [noting the *Van Beurden* "principle is recited again in *Palmer*" and "means a clerk's notice of entry of judgment must state, in so many words, that it is given 'upon order of the court' or 'under section 664.5' in order to trigger the time to file a [post-trial motion]"].) *Palmer* did not involve a court clerk mailing the judgment to the parties, as occurred here, but instead addressed the requirements that apply when one of the parties mails notice of entry of the judgment to the other party's attorney. (*Palmer*, at pp. 1268, 1270; see *id.* at p. 1278 ["an opinion is not authority for a proposition not therein considered" (cleaned up)].)

18

Therefore, the 15-day notice period for filing and service of defendants' notices of posttrial motions did not begin to run on December 15, 2022. Instead, it commenced on January 9, 2023, when plaintiffs served written notice of entry of judgment. (See § 659, subd. (a)(2) ["service upon [the movant] by any party of written notice of entry of judgment" triggers 15-day period for filing and service of notice of intention to move for new trial].) At that time, defendants had already filed and served notice of their posttrial motions on January 3, which was within 15 days of the January 9 notice. (See *ibid.*) Their notices of posttrial motions were therefore timely. This was our rationale for denying plaintiffs' motion to dismiss. To the extent plaintiffs reassert the same arguments in their respondents' brief, we reject them once again for the reasons just explained.

B.  *Plaintiffs' New Challenges to the Timeliness of Defendants' Notice of Appeal Lack Merit*

We reject plaintiffs' two new positions that defendants' notice of appeal was untimely, too.

First, plaintiffs observe the notice of appeal identifies as among the appealed orders the trial court's November 8, 2022 orders granting plaintiffs' motion for attorney fees and denying defendants' motion for attorney fees and motion to tax costs. Plaintiffs challenge our jurisdiction to review these orders. They argue "[t]here is no appellate jurisdiction" under section 904.1, subdivision (a)(2), over prejudgment orders relating to attorney fees and costs. Alternatively, they contend the notice of appeal of the orders was untimely because it was not filed within 60 days of November 8.

Plaintiffs' arguments are underdeveloped and ultimately immaterial. As to their first argument, although the orders denying defendants' attorney fees and granting plaintiffs' costs and fees were decided prejudgment, the subsequent judgment expressly included the plaintiffs' awards of attorney

19

fees and costs, as well as the denial of all monetary relief to the defendants. Plaintiffs fail to explain why the attorney fee and cost orders, if not independently appealable, are not appealable as a component of the one final judgment. (§ 904.1, subd. (a)(1).) Further, if not appealable as a component of the judgment, they are necessarily appealable as collateral orders directing the payment of money. (*Id.*, subd. (a)(2); *Hanna v. Mercedes-Benz USA* (2019) 36 Cal.App.5th 493, 506.)

As to plaintiffs' second argument, they fail to establish a timeliness problem. The shortened 60-day appeal period under rule 8.104(a)(1)(A) of the California Rules of Court does not apply unless the court clerk serves a " 'Notice of Entry' " of the appealable order or a "filed-endorsed" copy of the appealable order, showing the date either was served. The record does not reflect that the minute order relating to the trial court's award of attorney fees was served on the parties by a deputy court clerk. Although the minute order denying defendants' motion to tax costs and awarding plaintiffs their costs was served on the parties by a deputy court clerk, there was no notice of entry and the minute order was not "filed-endorsed." (See Cal. Rules of Court, rule 8.104(a)(1)(A).) Nor does the record reveal that any party served notice of entry of the orders. (See *id.*, rule 8.104(a)(1)(B).) Accordingly, plaintiffs' contention that a 60-day appeal period (rather than the default 180-day period) is applicable to the attorney fee and costs orders lacks merit. The notice of appeal was filed and served within 180 days of entry of the fee and cost orders. (See *id.*, rule 8.104(c) ["What constitutes entry" (boldface omitted)].)

Third, even if we were to assume the orders should have been appealed within 60 days of November 8, 2022, the jurisdictional consequence of this assumption would ultimately be irrelevant. Although defendants' notice of

20

appeal encompassed the fee and cost orders, in their merits briefs they have not raised arguments attacking them. It is therefore immaterial whether we have jurisdiction to review the orders, because they have not been directly challenged. They will fall automatically as a consequence of our reversal of the judgment. (See *Purdy v. Johnson* (1929) 100 Cal.App. 416, 420 (*Purdy*) [after reversal of a judgment, "the matter of trial costs [is] set at large"]; accord *Allen v. Smith* (2002) 94 Cal.App.4th 1270, 1284 (*Allen*) [an award of prevailing party attorney fees does not stand even if not separately appealed; it " 'falls with a reversal of the judgment on which it is based' "].)

The other new issue raised by plaintiffs also relates to defendants' notice of appeal. Plaintiffs observe the notice identifies as among the appealed orders the trial court's orders denying defendants' motion for new trial and JNOV motion. Under rule 8.108(d)(1) of the California Rules of Court, the time to appeal the judgment is extended "[i]f any party serves and files a *valid* motion for judgment notwithstanding the verdict." (Italics added.) "As used in these provisions, the word 'valid' means only that the motion . . . or notice complies with all procedural requirements; it does not mean that the motion . . . or notice must also be substantively meritorious." (Advisory Committee com. to Cal. Rules of Court, rule 8.108.) Plaintiffs argue defendants' JNOV motion was not a "valid" motion extending the time to appeal under rule 8.108(d)(1) because "[v]alidity for a motion for judgment notwithstanding the verdict required a verdict" and "[t]here was no verdict."

We reject the argument for the following reasons. First, it is underdeveloped. Plaintiffs merely assert: "Validity for a motion for judgment notwithstanding the verdict required a verdict. There was no verdict." This is their entire argument. They fail to support their perfunctory assertions with citation to legal authority. We are not required

21

to develop plaintiffs' points for them.  Instead, we treat their contention as forfeited.  (See *Arega v. Bay Area Rapid Transit Dist.* (2022) 83 Cal.App.5th 308, 318 [rejecting respondent's challenge to the validity of a posttrial motion as insufficiently developed]; *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

Second, even if we were to find it meritorious, plaintiffs' argument would not establish that defendants' notice of appeal was untimely.  The JNOV motion and new trial motion (and notices thereof) were served, filed, and denied contemporaneously.  As we have discussed, defendants' notice of new trial motion was timely filed and served, and its procedural validity is otherwise unchallenged.  The filing and service of this notice was effective to extend the notice of appeal deadline on its own.  (Cal. Rules of Court, rule 8.108(b)(1)(A).)  For this reason, even if we were to decide that defendants' JNOV motion was mislabeled and for that reason invalid, this would not lead us to conclude their notice of appeal was untimely.  Next, we turn to defendants' substantial evidence challenges to the trial court's findings holding them liable for negligence and granting plaintiffs rescission of the lease.

## II.

*Substantial Evidence Does Not Support the Trial Court's Findings Holding Defendants Liable for Negligence and Granting Rescission of the Lease*

The following principles guide our review.  "The statement of decision provides the trial court's reasoning on disputed issues and is our touchstone to determine whether or not the trial court's decision is supported by the facts and the law." (*Slavin v. Borinstein* (1994) 25 Cal.App.4th 713, 718.)  We review the trial court's decisions of law de novo.  (*Gajanan Inc. v. City and County of San Francisco* (2022) 77 Cal.App.5th 780, 791–792.)  "We apply a

substantial evidence standard of review to the trial court's findings of fact." (*Thompson v. Asimos* (2016) 6 Cal.App.5th 970, 981 (*Thompson*).) "Under this deferential standard of review, findings of fact are liberally construed to support the judgment and we consider the evidence in the light most favorable to the prevailing party, drawing all reasonable inferences in support of the findings." (*Ibid.*)

Under the doctrine of implied findings, " 'the reviewing court must infer, following a bench trial, that the trial court impliedly made every factual finding necessary to support its decision.' " (*Thompson*, *supra*, 6 Cal.App.5th at p. 981.) However, "we cannot infer findings in support of the judgment from speculation or possibilities, but may only infer findings that result by necessary implication from the express findings that are made." (*Millbrae Asso. for Residential Survival v. Millbrae* (1968) 262 Cal.App.2d 222, 238.) " '[A] finding should not be presumed or implied where the record discloses that the trial court expressly declined to make it.' " (*Wise v. Clapper* (1968) 257 Cal.App.2d 770, 776, accord *Reid v. Moskovitz* (1989) 208 Cal.App.3d 29, 32 (*Reid*).)

A.    *The Negligence Claim*

Defendants contend substantial evidence does not support the trial court's finding that they were liable for negligence. They specifically contend expert testimony on medical causation was required, and that plaintiffs failed to produce competent expert testimony supporting a link between the state of the HVAC system servicing the EDS suite and the symptoms experienced by EDS employees, including Leon. We agree.

Plaintiffs' negligence claim sought damages based on Leon's alleged injuries from "[t]he ongoing failure of the HVAC and ventilation system." Proximate cause is an essential element of negligence. (*Leyva v. Garcia*

23

(2018) 20 Cal.App.5th 1095, 1103 (*Leyva*).) "[F]or a plaintiff to satisfy the causation element of a negligence cause of action, he or she must show the defendant's act or omission was a substantial factor in bringing about the plaintiff's harm. . . . 'In other words, [the] plaintiff must show some substantial link or nexus between omission and injury.'" (*Id.* at p. 1104, citation omitted.) Although the trial court appeared to rely on an unalleged premises liability theory to hold defendants negligent, the causation requirement is the same. (See *id.* at p. 1103 ["Both [negligence and premises liability] are negligence claims."].)

Ordinarily, a plaintiff may establish proximate cause without the testimony of an expert by providing evidence that indicates the defendant's conduct was a substantial factor in producing plaintiff's damages. However, "[t]he law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case. That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, it becomes more likely than not that the injury was a result of its action. This is the outer limit of inference upon which an issue may be submitted to the jury." (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402–403.) " 'The fact that a determination of causation is difficult to establish cannot . . . provide a plaintiff with an excuse to dispense with the introduction of some reasonably reliable evidence proving this essential element of his case.'" (*Leslie G. v. Perry & Associates* (1996) 43 Cal.App.4th 472, 487 (*Leslie G.*).) Expert

24

testimony " 'can enable a plaintiff's action to go to the jury only if it establishes a reasonably probable causal connection between an act and a present injury.' " (*Ibid.*)

Proof of causation requires expert testimony where the complexity of the causation issue is beyond common experience. That is the case here. The source of contaminants in a building, and their capacity to cause medical symptoms, are issues outside common knowledge; thus they require expert testimony. (See *Beebe v. Wonderful Pistachios & Almonds LLC* (2023) 92 Cal.App.5th 351, 370 (*Beebe*) [expert testimony on causation required in a case of alleged toxic exposure]; *Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1336–1337 (*Miranda*) [expert testimony required to establish plaintiff contracted infectious fungal disease as the result of exposure to fungal spores in defendant's uncovered dirt pile]; *Webster v. Claremont Yoga* (2018) 26 Cal.App.5th 284, 290 (*Webster*) [expert testimony required to create triable issue of fact whether plaintiff's orthopedic injuries were caused by yoga instructor's adjustment of her posture during a class]; *Garbell v. Conejo Hardwoods, Inc.* (2011) 193 Cal.App.4th 1563, 1569 [causation of residential fire was not a matter of common knowledge and required expert testimony].)

Here, plaintiffs presented only two expert witnesses—Dr. Mercer and Dr. Pleskow—to establish the etiology of Leon's symptoms. Mercer's objective testing (lung auscultation and oxygen saturation rate) failed to substantiate Leon's claim he was experiencing congestion and breathing difficulties. Although Mercer detected fine rashes at one visit, he was unable to determine their cause. He had no opinion whether there was an air contaminant in the EDS suite. His testimony did not assist plaintiffs.

Dr. Pleskow, who saw Leon in 2021, almost two years after the fact (at a time when Leon's symptoms had already resolved), determined he was allergic to dust mites. Based on this, and on the oral history provided by Leon that "an industrial hygienist had come to inspect his . . . office, and a contaminated and leaking HVAC was found," that Leon experienced "blistering of the skin . . . until September or October of 2019" and "congestion in his chest and sinuses . . . until December of 2019," and that Leon "was better away from the office," Pleskow formed a "suspicion that dust mites were the problem." He agreed, however, the complaints Leon voiced to him "could have a number of causes." He was not asked to identify the other causes. Asked to provide his opinion on medical causation within a reasonable degree of medical probability, he testified: "My opinion is that [Leon] was sick from exposure *to something in that environment*." (Italics added.) But he conceded he did not know "what, if anything, was going on in that environment."

Defendants argue, and we agree, Dr. Pleskow's causation opinion—that Leon's symptoms were caused by "something in that environment"—was conclusory and relied on unproven facts, and therefore did not constitute substantial evidence supporting the judgment. "[E]ven when [a] witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. For example, an expert's opinion based on assumptions of fact without evidentiary support, or on speculative or conjectural factors, has no evidentiary value and may be excluded from evidence. Similarly, when an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an expert opinion is worth no more than the reasons upon which it rests."

26

(*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 (*Jennings*), cleaned up [upholding exclusion of conclusory expert testimony].) Expert testimony that is unsupported or overly conclusory under *Jennings* does not constitute substantial evidence sufficient to uphold a judgment. (See e.g., *People v. Prunty* (2015) 62 Cal.4th 59, 85 (*Prunty*) [citing *Jennings*; holding that conclusory expert testimony was "essentially of no use to the fact finder" and did not constitute substantial evidence in support the verdict]; *Robinson v. Superior Court* (2023) 88 Cal.App.5th 1144, 1170 (*Robinson*) [citing *Jennings*; holding expert opinion did not constitute substantial evidence where no facts in the record supported it].)

In *Jennings*, a medical expert testified about the cause of a postoperative infection developed by the plaintiff. The issue was whether the infection was caused by a retractor (a surgical device used to harness the bowels and keep them out of the operating field) negligently left in the plaintiff's abdominal cavity after the surgery. (*Jennings*, *supra*, 114 Cal.App.4th at pp. 1112–1113, 1114–1115.) Although the expert opined the retractor was a cause-in-fact of the infection, his "articulated explanation of the etiology of the infection . . . was conclusory." (*Id.* at p. 1115.) "His explanation was, in essence, that because the retractor was left in place and was probably contaminated, and a nearby area later became infected, '[i]t just sort of makes sense. We have that ribbon retractor and [it's] contaminated, he's infected.'" (*Ibid.*) The trial court excluded the expert's testimony, and this court affirmed. We held that to the extent the expert testified the retractor "could have provided a nidus for bacteria to grow inside [the plaintiff's] peritoneal cavity" if a constellation of events had coalesced, the testimony was "not helpful to the jury" absent additional evidence that it was more likely than not bacteria around the retractor migrated to and were a

27

cause-in-fact of the infection. (*Id.* at p. 1119.) We further held that to the extent the expert testified bacteria growing around the retractor were a cause-in-fact of the infection, his opinion was "too conclusory to support a jury verdict on causation" because it was "unaccompanied by any reasoned explanation supporting his opinion." (*Id.* at p. 1120.)

Here, much as in *Jennings*, Dr. Pleskow's causation opinion was speculative and unsupported by evidence in the record as well as conclusory and lacking in a reasoned explanation. First, Pleskow's opinion was without evidentiary support to the extent it relied on Leon's assertion that an industrial hygienist had determined the HVAC unit to be leaking and contaminated; this assertion was unsupported (and indeed, was contradicted) by the evidence in the record. Second, it was conclusory and devoid of a reasoned explanation that would assist the trier of fact. His reasoning was essentially that because Leon reported his symptoms were worse when he was at the office, "something" in the office must be causing them. This logic is no different from the reasoning a lay person might employ. It did not tend to illuminate for the fact finder what the causal mechanism might be from a medical standpoint nor did it provide assistance in identifying the potential causes within the office environment. "[A]n expert's conclusory opinion that something did occur, when unaccompanied by a reasoned explanation illuminating how the expert employed his or her superior knowledge and training to connect the facts with the ultimate conclusion, does not assist the jury." (*Jennings*, *supra*, 114 Cal.App.4th at p. 1117.)

For these reasons, we agree with defendants Dr. Pleskow's opinion "[Leon] was sick from exposure to something in that environment" is insufficient to support a finding that defendants' actions or omissions were a cause of Leon's symptoms. (*Prunty*, *supra*, 62 Cal.4th at pp. 84–85; *Robinson*,

28

*supra*, 88 Cal.App.5th at p. 1170.)  Because competent expert testimony regarding the medical cause of Leon's injuries was required in order to hold defendants liable for negligence (*Miranda*, *supra*, 187 Cal.App.4th at p. 1336), and Pleskow was the only medical expert to offer testimony in plaintiffs' favor on that topic, the court's finding that defendants were liable for negligence must be reversed.

In their respondents' brief, plaintiffs do not address *Jennings* nor do they dispute defendants' contention that Dr. Pleskow's causation opinion does not constitute substantial evidence supporting the judgment.  Instead, they quote the portion of the statement of decision in which the trial court found their witnesses "to be credible regarding their complaints of symptoms" and went on to state:  It was "more likely than not some type of contaminant within the leased premises caused their symptoms to occur.  *While Plaintiffs have not shown what specific contaminant was present, such does not preclude a finding that the unknown contaminant caused the symptoms about which the complainants testified.*"  (Italics added.)  The court cited in support of this conclusion the expert testimony that "the HVAC unit . . . was not clean and had been poorly maintained" and a significant amount of dust "had accumulated on the desktops and exposed carpet in the office in the summer of 2019."  Plaintiffs assert the court believed their witnesses, and thus implicitly argue the trial court's decision on liability was a credibility finding we may not reweigh.

We are not persuaded by this assertion, and with plaintiffs' reliance on the statement of decision, for several reasons.  First, the issue raised by defendants does not relate to credibility.  As we have explained, plaintiffs were required to prove causation " 'within a reasonable medical probability based upon *competent* expert testimony.' "  (*Miranda, supra,* 187 Cal.App.4th

29

at p. 1336, italics added.) The deficiencies in Dr. Pleskow's causation opinion under *Jennings* go to the evidentiary value of his testimony, not his credibility as a witness.

Second, to the extent the trial court found plaintiffs' *other* witnesses aside from Dr. Pleskow to be credible, their testimony was not capable of establishing medical causation. In a case of alleged toxic exposure, " 'plaintiffs must establish, to a *reasonable medical probability, their illnesses* were caused by the toxic exposure.' " (*Beebe, supra*, 92 Cal.App.5th at p. 370.) " 'Expert testimony is . . . required on the issue of causation if the matter is so beyond lay experience that it can be explained *only* through experts.' " (*Ibid.*; see *Cottle v. Superior Court* (1992) 3 Cal.App.4th 1367, 1384 [" 'The law is well settled that in a personal injury action causation must be *proven within a reasonable medical probability based upon competent expert testimony*.' "]; *Whiteley v. Philip Morris, Inc.* (2004) 117 Cal.App.4th 635, 701 ["In toxic tort cases generally, 'plaintiffs must establish, to a *reasonable medical probability, their illnesses* were caused by the toxic exposure.' "].) Lay witnesses, and experts in non-medical fields, lack medical expertise necessary to establish the etiology of symptoms caused by contaminant exposure to a reasonable degree of medical probability. (*Beebe, supra*, 92 Cal.App.5th at p. 370; *Miranda, supra,* 187 Cal.App.4th at pp. 1336–1337; see *Webster, supra*, 26 Cal.App.5th at p. 290.) "In California, causation must be founded upon expert testimony and cannot be inferred from the jury's consideration of the totality of the circumstances unless those circumstances include the requisite expert testimony on causation." (*Cottle,* at p. 1385.)

Third, we disagree with the trial court's conclusion that plaintiffs' failure to show "what specific contaminant was present" did not "preclude a

finding that the *unknown contaminant caused the symptoms* about which the complainants testified." (Italics added.) " 'The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony.' " (*Miranda, supra*, 187 Cal.App.4th at p. 1336.) " 'A mere possibility of . . . causation is not enough.' " (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 775–776 (*Saelzler*).) Notably, the trial court's finding that plaintiffs failed to show "what specific contaminant was present" and that the contaminant was "unknown" reflects that it (properly) rejected Dr. Pleskow's suspicion of dust mites. A suspicion is equivalent to a *mere possibility* of causation and was therefore not enough to prove dust mites were, in fact, the probable cause of Leon's symptoms. For purposes of our review, we are required to accept the court's express finding the symptoms were caused by an "unknown contaminant" (or in Pleskow's words, "something in that environment") and may not infer a finding the causal agent was specifically established. (See *Reid, supra*, 208 Cal.App.3d at p. 32 [appellate court will not infer an implied finding was made by trial court where the record shows the trial court expressly declined to make it]; *Matson v. Jones* (1969) 272 Cal.App.2d 826, 832 [" 'A reviewing court will not disturb the implied findings made by a trial court in support of a judgment any more than it will interfere with express findings on which a final judgment is predicated.' "].)

The difficulty with the trial court's reasoning—that it could find causation even as the injury-causing substance remained "unknown"—is that it inherently rests on speculation. "Although proof of causation may be by direct or circumstantial evidence, it must be by 'substantial' evidence, and evidence 'which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient.' " (*Leslie G., supra,* 43

31

Cal.App.4th at p. 484.) For defendants to be held liable for injuring Leon, plaintiffs needed to show the symptoms "were caused by the act of the defendant or by an instrumentality under the defendant[s'] control." (*Sindell v. Abbott Laboratories* (1980) 26 Cal.3d 588, 597.) Moreover, the symptoms needed to be causally connected with the defendants' negligence. (*Saelzler, supra*, 25 Cal.4th at p. 773.) Here, the instrumentality impliedly found to be under defendants' control was the HVAC system; their alleged negligence involved the failure to clean or adequately maintain it.

Plaintiffs therefore needed to establish a causal chain linking Leon's symptoms with the state of the HVAC system. However, with the identity of the injury-causing contaminant unknown (and with the symptoms possessing "a number of causes") every causal chain one attempts to construct inevitably contains an unknown variable. One has to speculate about the causal pathway, including the substance that may have caused the symptoms, its characteristics, how it entered the suite, and whether improved maintenance or cleaning of the HVAC system likely would have prevented exposure. "Speculation, however, is not evidence." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 864.) For these reasons, the trial court's determination there was a causal connection between Leon's symptoms, the "unknown contaminant," and defendants' omissions was speculative and unsupported by substantial evidence.

*Bockrath v. Aldrich Chemical Co.* (1999) 21 Cal.4th 71 supports our conclusion that plaintiffs could not establish the necessary element of causation without evidence establishing the etiology of Leon's symptoms, or the substance that caused them. The plaintiff in *Bockrath* sued defendant manufacturers for a variety of torts, including negligence, claiming his cancer was caused by exposure to chemicals and chemical ingredients with

32

carcinogenic effects. Our high court held that to adequately allege each defendant's product was a substantial factor in causing his illness, the plaintiff was required to expressly allege, among other things, that "he was exposed to each of the toxic materials claimed to have caused *a specific illness*" and "that he suffers from *a specific illness*, and that each toxin that entered his body was a substantial factor in bringing about, prolonging, or aggravating *that illness*." (*Id.* at pp. 79–80, italics added.) *Bockrath* teaches us that in a case of alleged health effects from toxic exposure, causation cannot be established without proof of the identity of the pathogen or the etiology of the plaintiff's symptoms.

Plaintiffs attempt to avoid the deficiency in their showing of causation by arguing that defendants' liability was based on "landowner's liability." They cite *Alcaraz v. Vece* (1997) 14 Cal.4th 1149, 1156 (*Alcaraz*) for the propositions that persons must " 'maintain land in their possession and control in a reasonably safe condition' " and "[t]his duty to maintain land in one's possession in a reasonably safe condition exists even where the dangerous condition on the land is caused by an instrumentality that the landowner does not own or control.' " But there is a problem with plaintiffs' reliance on the general duty of care owed by the possessor of property. It was EDS, as lessee, that was in possession and control of the EDS suite, *not* the lessor defendants. As stated in *Alcaraz*, "The duties owed in connection with the condition of land are not invariably placed on the person holding title but, rather, are owed by the person in possession of the land because of the possessor's supervisory control over the activities conducted upon, and the condition of, the land." (*Id.* at pp. 1157–1158 [cleaned up]; see *Garcia v. Holt* (2015) 242 Cal.App.4th 600, 604 ["Public policy precludes landlord liability for a dangerous condition on the premises which came into existence after

33

possession has passed to a tenant. . . . This is based on the principle that *the landlord has surrendered possession and control of the land to the tenant* and has no right even to enter without permission." (Italics added, citation omitted.).]

*Alcaraz* does not help plaintiffs for another reason. There, the plaintiff-tenant was allegedly injured from stepping into a meter box located on a strip of land *outside* the apartment occupied by the plaintiff-tenant, in an area the landlord-defendants regularly maintained. (*Alcaraz, supra,* 14 Cal.4th at pp. 1153–1154.) Our high court found there was an issue of fact whether the defendants exercised control over the strip of land, precluding entry of summary judgment in their favor. (*Id.* at pp. 1152–1153.) No such facts were shown to exist here that would demonstrate defendants exercised control over the EDS suite. To the contrary, the evidence was that EDS was in continuous possession of the suite from February until July 2019. Accordingly, *Alcaraz* is inapposite.

In sum, we conclude plaintiffs failed to prove a causal link between the state of the HVAC system servicing the EDS suite and the symptoms described by Leon and EDS employees.[11] The trial court's finding that defendants were liable for negligence was therefore unsupported by substantial evidence. Defendants contend this conclusion also necessitates

---

[11] Dr. Pleskow was the only medical expert to opine on the cause of the reported symptoms, and the trial court's finding that an "unknown contaminant caused the symptoms about which the complainants testified" applies equally to all of the complaining witnesses. Thus, for the same reason the evidence was insufficient to establish the cause of Leon's symptoms, so too was it insufficient to establish the cause of the symptoms of EDS employees.

reversal of the trial court's decision granting rescission of the lease. As we explain next, we agree.

B. *Rescission*

Under the circumstances of this case, plaintiffs needed to prove a causal connection between the symptoms experienced by Leon and others in the EDS suite and defendants' inadequate maintenance of the HVAC system in order to obtain rescission. A party to a contract may rescind the contract "[i]f the consideration for the obligation of the rescinding party fails, in whole or in part, *through the fault of the party as to whom he rescinds*" (Civ. Code, § 1689, subd. (b)(2), italics added) or "[i]f the consideration for the obligation of the rescinding party, *before it is rendered to him*, fails in a material respect *from any cause*" (*id*., subd. (b)(4), italics added). In granting rescission, the trial court cited both of these provisions, implying it believed both of them were satisfied. Defendants argue this was error. We agree.

As a matter of law, rescission was unavailable under subdivision (b)(4) of Civil Code section 1689, which applies only when consideration fails "*before it is rendered.*" (Italics added.) That did not occur here. A leasehold endures for the period defined in the lease. (12 Witkin, Summary Cal. Law (11th ed. 2017) § 528, p. 594.) The contractual obligation of the landlord at the inception of a lease is to deliver possession of the premises to the new tenant. (See e.g., Cal. Practice Guide: Landlord-Tenant (The Rutter Group 2023), ¶ 2:850, p. 2F-1; *Reynolds v. McEwen* (1952) 111 Cal.App.2d 540, 542–543; *Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141, 1155–1156 (*Cunningham*).) Here, the parties' lease was for a defined term beginning February 1, 2019 and ending January 31, 2022. EDS undisputedly received possession of the leased premises in February 2019 and enjoyed materially undisturbed possession of the suite for a period of five months,

35

through at least the end of June. Defendants' consideration under the lease—delivery of possession of the leased premises to EDS, and EDS's undisturbed quiet enjoyment of the suite—therefore did not fail before it was rendered. (Cf. Civ. Code, § 1689, subd. (b)(4) [rescission available "[i]f the consideration for the obligation of the rescinding party" fails "from any cause" "before it is rendered to him"]; see *Koenig v. Warner Unified School Dist.* (2019) 41 Cal.App.5th 43, 59–60 [contracting party not entitled to rescission of a termination agreement under Civ. Code, § 1689, subd. (b)(4) where party received, under the termination agreement, one year of salary and benefits payments to which he would not otherwise have been entitled].)

Rescission was therefore available, if at all, only under subdivision (b)(2) of Civil Code section 1689, which applies when the consideration owed to the rescinding party fails *through the fault of the party as to whom he rescinds.*" (Italics added.) This provision requires proof of a material breach by the non-rescinding party. (*Crofoot Lumber, Inc. v. Thompson* (1958) 163 Cal.App.2d 324, 332–333; *Integrated, Inc. v. Alec Fergusson Electrical Contractor* (1967) 250 Cal.App.2d 287, 295–296; *Wyler v. Feuer* (1978) 85 Cal.App.3d 392, 403–404 (*Wyler*).) Here, as a basis for rescission, plaintiffs asserted, and the trial court found, defendants breached the covenant of quiet enjoyment, which is both inherent in the parties' lease (Civ. Code, § 1927) and included in the lease as an express provision.[12] But rescission was also

---

[12] The relevant provisions are as follows: "An agreement to let upon hire binds the letter to secure to the hirer the quiet possession of the thing hired during the term of the hiring, against all persons lawfully claiming the same." (Civ. Code, § 1927.) Paragraph 38 of the lease, titled "**Quiet Possession**," states: "Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions, and provisions on Lessee's

not available on this basis because there was insufficient proof of a causal connection between any action by defendants and the assertedly unfit state of the EDS suite, a necessary component of a claimed breach of the covenant of quiet enjoyment.

Quiet enjoyment "insulates the tenant against any act or omission on the part of the landlord, or anyone claiming under him, which interferes with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy." (*Petroleum Collections Inc. v. Swords* (1975) 48 Cal.App.3d 841, 846 (*Petroleum Collections*).) "[T]he landlord's failure to fulfill an obligation to repair or to replace an essential structure or to provide a necessary service *can result* in a breach of the covenant if the failure substantially affects the tenant's beneficial enjoyment of the premises." (*Ibid.*) "Minor inconveniences and annoyances are not actionable breaches. Rather, the landlord's act or omission must be *substantial*—i.e., so serious as to render the premises *unfit* for the purposes contemplated by the lease or which *substantially* affect the tenant's enjoyment of a *material* part of the premises." (Cal. Practice Guide: Landlord Tenant (The Rutter Group 2023) ¶4:8, p. 4-5.)

A necessary component of a claimed breach of the covenant of quiet enjoyment is a causal connection between the landlord's actions or omissions and the assertedly unfit state of the premises. " 'Breach can take many forms, including actual or constructive eviction.' " (*Nativi v. Deutsche Bank National Trust Co.* (2014) 223 Cal.App.4th 261, 293 (*Nativi*).) "[A]n actual eviction takes place when the tenant is physically dispossessed of the property; a constructive eviction occurs when the act of molestation merely

_____

part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof."

37

affects the beneficial use of the property, causing the tenant to vacate the premises." (*Petroleum Collections, supra,* 48 Cal.App.3d at p. 847; *Lee v. Placer Title Co.* (1994) 28 Cal.App.4th 503, 512 [covenant of quiet enjoyment "insulates the tenant against any act or omission on the part of the landlord, or anyone claiming under him, which interferes with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy"]; *Cunningham, supra,* 98 Cal.App.4th at p. 1152 ["An eviction is constructive if the landlord engages in acts that render the premises unfit for occupancy for the purpose for which it was leased[.]"].) "Except to the extent the parties to a lease validly agree otherwise, there is a breach of the landlord's obligations if, after the tenant's entry and without fault of the tenant, a change in the condition of the leased property caused by the landlord's conduct or failure to fulfill an obligation to repair . . . makes the leased property unsuitable for the use contemplated by the parties[.]" (Rest.2d Prop., Landlord & Tenant, § 5.4, pp. 194–195; see *id.* com. *b*, p. 196. ["Affirmative conduct of the landlord that makes the condition of the leased property unsuitable or the failure of the landlord to fulfill an obligation to repair thereby making the leased property unsuitable is sometimes referred to as a constructive eviction by the landlord[.]"].) "Determining whether there has been a breach of the covenant of quiet possession generally depends upon the facts in a proper case." (*Nativi*, at p. 293 [cleaned up].)

In deciding for the plaintiffs, the trial court found in part that defendants materially breached the covenant of quiet enjoyment and failed to comply with their duties under the lease by refusing to clean the HVAC ducts, thereby failing to provide EDS with "usable office space." As best we can discern from its discussion in the statement of decision of witness credibility, quiet enjoyment, and rescission, the court found the office space

was rendered not "usable" because defendants' inadequate maintenance of the HVAC was causally connected with the adverse health effects experienced by Leon and EDS staff, requiring them to vacate the office and work from home.[13] This onset of symptoms was the implicit basis for the court's conclusion the office space had been rendered not "usable." The court's ruling thus rested on the same faulty causation finding that supported its erroneous resolution of the negligence claim, namely, that an "unknown contaminant caused [plaintiffs'] symptoms." This requires reversal of the rescission claim, too.

As discussed, plaintiffs' only evidence establishing to a reasonable degree of medical probability the cause of any of the reported symptoms was the testimony of Dr. Pleskow, whose causation opinion we have already found insufficient. (*Jennings*, *supra*, 114 Cal.App.4th at p. 1117; *Robinson*, *supra*, 88 Cal.App.5th at p. 1170; *Prunty*, *supra*, 62 Cal.4th at pp. 84–85.) The trial

---

[13] For example, the section of the statement of decision titled "**Rescission**" immediately followed the section titled "**Witness Credibility**," in which the trial court found "the unknown contaminant" caused the symptoms of plaintiffs' witnesses. And in granting rescission of the lease, the court observed that "[p]laintiff[s'] witnesses testified that the onset of symptoms was within one-half hour of exposure."

The decision also stated: "Defendants argued that [Leon] sent threatening texts to Mauzy. Perceived threats did not relieve [d]efendants of their duty to investigate. . . . Entering EDS's suite for an hour *may have confirmed or denied* [*sic*] EDS's complaints, yet Lessors took no such action." Assuming this was intended as a finding of breach of a duty to investigate, we do not interpret it as a finding any such breach was material given the court's failure to affirmatively find performance would have confirmed (as opposed to "denied") EDS's claims regarding the source of the contamination. (See *Mora v. Baker Commodities* (1989) 210 Cal.App.3d 771, 782 ["the duty to inspect charges the lessor 'only with those matters which would have been disclosed by a reasonable inspection' "].)

39

court's finding that plaintiffs failed to establish anything more than that an "unknown contaminant" triggered their symptoms is fatal to the conclusion defendants' omissions with respect to HVAC maintenance caused the condition that assertedly rendered the suite unusable. It leaves a necessary link in the causal chain as an undetermined variable. It is not possible, without guessing or speculating, to draw an affirmative inference about the propensities of an unknown substance, including its characteristics, its capacity to cause particular health symptoms, and whether its presence in the suite likely would have been eliminated with duct cleaning or improved HVAC maintenance. (See *Leslie G.*, *supra*, 43 Cal.App.4th at p. 484 ["Although proof of causation may be by direct or circumstantial evidence, it must be by 'substantial' evidence, and evidence 'which leaves the determination of these essential facts in the realm of mere speculation and conjecture is insufficient.' "]; *Marshall v. Parkes* (1960) 181 Cal.App.2d 650, 655 [where the evidence is such that it is a matter of conjecture whether a particular deduction is warranted from the facts which are known, there is no basis for a legally sufficient inference].) Consequently, we conclude there is insufficient evidence to support the trial court's decision to grant rescission on the basis defendants' omissions with respect to the HVAC system caused the reported symptoms, thereby rendering EDS's suite unusable. (See *Nativi*, *supra*, 223 Cal.App.4th at p. 310 [summary adjudication of claim for breach of covenant of quiet enjoyment properly granted where tenants failed to provide evidence from which a reasonable trier of fact could infer the conduct of the landlord was a cause of the situation that kept one of them from returning to live in the premises].)

After declaring the lease rescinded, the trial court incongruously asserted that plaintiffs would remain entitled to rescission "[e]ven if the . . .

40

duct cleaning would not have fixed the [plaintiffs' health] problems" based on defendants' failure "to deliver their consideration, usable office space." This finding relied on a legally erroneous understanding of delivery of the leased premises as occurring mid-lease. It also appeared to rely on a related, equally erroneous belief rescission from any cause was available under Civil Code section 1689, subdivision (b)(4). And to the extent the court intended its finding to justify rescission under Civil Code section 1689, subdivision (b)(2), that basis also fails because no substantial evidence was presented to show defendants caused the office space to become unusable by means other than their omissions with respect to the HVAC system.

Plaintiffs offer a threefold response to defendants' insufficiency of the evidence challenge. First, they argue: "Rescission is proper when the lessor failed to deliver usable office space." This confuses the concept of delivery of the premises with the concept of breach of the lease. As we have explained, delivery of possession of the premises occurs at the outset of the lease. EDS undisputedly received possession of the leased premises in February 2019 and enjoyed materially undisturbed possession through the end of June. So there was no established breach of defendants' delivery obligation under the lease.

Second, plaintiffs deny that defendants' refusal to clean the HVAC ducts had anything to do with the trial court's decision to rescind the lease. They assert the court's decision was based on defendants' simple failure to "deliver[ ] their consideration, usable office space, after mid-July 2019." This ignores that the court found defendants' refusal to "clean the ducts . . . until [d]efendants provided medical proof that the office was the cause of their health problems" constituted the failure to "comply with . . . contractual duties" that rendered the suite not "usable." And to the extent plaintiffs are

41

contending the trial court granted rescission regardless of cause, they are conceding the very point on which defendants seek reversal.

Third, plaintiffs argue: "[Defendants] failed to present any evidence that . . . EDS was able to use its office space, which is the only basis that would justify a reversal of the trial court." We are not persuaded by this effort, unaccompanied by any citation to legal authority, to cast the burden of proof as resting upon defendants. (*Atchley* v. *City of Fresno* (1984) 151 Cal.App.3d 635, 647 [when a point is asserted without authority for the proposition, "it is deemed to be without foundation and requires no discussion by the reviewing court"].) To obtain rescission, plaintiffs needed to establish the consideration for the lease failed due to defendants' fault. (Civ. Code, § 1689, subd. (b)(2).) This, in turn, required plaintiffs to present evidence sufficient to prove defendants committed a material breach of the lease. (See, e.g., *Wyler*, *supra*, 85 Cal.App.3d at pp. 403–404; *Richman v. Hartley* (2014) 224 Cal.App.4th 1182, 1186 [plaintiff's burden to prove breach of agreement].) As we have explained, they failed to do so.

C.    *Conclusion*

We conclude there was not substantial evidence to support the trial court's determinations that defendants were liable for negligence or that they materially breached the lease so as to support rescission of the lease under subdivision (b)(2) of Civil Code section 1689.[14] The award to EDS of $336,355.40 in consequential damages is therefore also unsupported, as the only basis for this award was that it was justified by rescission of the lease.

---

[14]    Our resolution of defendants' sufficiency of the evidence challenge makes it unnecessary for us to reach defendants' remaining challenges to the propriety of the trial court's rescission of the lease and award of damages to EDS.

42

(See *Hedging Concepts, Inc. v. First Alliance Mortgage Co.* (1996) 41 Cal.App.4th 1410, 1422 [determination that trial court erred in declaring contract rescinded meant quantum meruit award to rescinding party could not be supported on the theory it was justified by rescission].) Further unsupported is the trial court's award of $50,000 in general damages to Leon based on defendants' negligence, as well as its determination that rescission of the lease mooted the defendants' cross-claims based on breach of the lease.

Defendants ask us to reverse the judgment and remand the matter "for an award of damages on [their] cross-complaint and a determination of the other appropriate relief to which [they] are entitled based on the parties' enforceable agreements in the lease." We agree in part. Defendants have not challenged the trial court's decision to grant plaintiffs rescission of the guaranty of lease, nor have they requested a remand for further proceedings on the guaranty of lease. Further, the trial court's decision to grant rescission of the guaranty of lease appears to have rested in part on considerations independent of its decision to rescind the lease. As a result, we will not disturb the trial court's rescission of the guaranty of lease.

However, our conclusion above with respect to the insufficiency of the evidence supports defendants' request for reversal *without retrial*. " '[F]or our justice system to function, it is necessary that litigants assume responsibility for the complete litigation of their cause during the proceedings.' " (*Kelly v. Haag* (2006) 145 Cal.App.4th 910, 919.) Plaintiffs had a full and fair opportunity during the 11-day trial to present evidence supporting their claims. During trial, defendants brought a dispositive motion on numerous grounds, including insufficiency of the evidence of causation, "putting [plaintiffs] on heightened notice of the need to produce sufficient evidence on its . . . claims." (*Cardinal Health 301, Inc. v. Tyco*

43

*Electronics Corp.* (2008) 169 Cal.App.4th 116, 153.) Further, plaintiffs have not opposed defendants' position with respect to the scope of proceedings on remand nor have they "suggested the existence of any new evidence that could be presented on retrial." (*Ibid.*; see also *Wal-Noon Corp. v. Hill* (1975) 45 Cal.App.3d 605, 615 [reversing judgment after bench trial without ordering retrial where "[t]he parties have had their day in court on the contract" such that "[n]o retrial of the matter is necessary" but instructing the court to modify its conclusions of law].)

Accordingly, we will reverse the judgment in part, to the extent the trial court found defendants liable for negligence; granted plaintiffs rescission of the lease; awarded damages in the amount of $50,000 to Leon and in the amount of $336,355.40 to EDS; and dismissed defendants' cross-claims against plaintiffs based on breach of the lease. There will be no retrial of plaintiffs' causes of action for negligence or rescission of the lease. Instead, on remand, the negligence finding against defendants as well as the finding against defendants on rescission of the lease shall be reversed. The trial court shall conduct further proceedings on defendants' cross-claims against plaintiffs based on the lease. At the conclusion of those proceedings, judgment is to be entered for defendants and against plaintiffs on plaintiffs' causes of action for negligence, breach of lease, and negligent misrepresentation; for defendants and against plaintiffs on plaintiffs' claim for rescission of the lease; for plaintiffs and against defendants on plaintiffs' claim for rescission of the guaranty of lease; for plaintiffs and against defendants on defendants' cross-claims based on the guaranty of lease; and to otherwise reflect the outcome of the proceedings on remand.

The trial court's orders determining plaintiffs to be the prevailing parties and awarding them attorney fees and costs necessarily fall with our

44

partial reversal of the judgment and will need to be redetermined at the conclusion of the proceedings on remand.  (*Purdy*, *supra*, 100 Cal.App. at p. 421; *Allen*, *supra*, 94 Cal.App.4th at p. 1284.)

## DISPOSITION

The judgment is reversed in part to the extent it encompasses the trial court's findings holding defendants liable for negligence; granting plaintiffs rescission of the lease; awarding damages to Richard Leon and EDS based on negligence and rescission of the lease; and dismissing defendants' cross-claims against plaintiffs based on the lease.  On remand, the trial court is directed to proceed consistently with the instructions in this opinion.  The judgment is otherwise affirmed.  Defendants are entitled to their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (3).)


DO, J.

WE CONCUR:


McCONNELL, P. J.


RUBIN, J.

45